# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### March 2000 Session

## JOSEPH BLOUNT TURNER v. GLORIA JEAN WEISS TURNER

**Appeal from the Circuit Court for Davidson County**
**No. 97D-2292    Marietta M. Shipley, Judge**

---

### No. M1999-00482-COA-R3-CV - Filed September 28, 2000

---

This is a divorce case. Following a bench trial, the court below (1) granted a divorce to wife; (2) divided the marital property; (3) awarded wife alimony in the form of a $1,640.55 monthly payment out of husband's retirement account; and (4) declared that the alimony award was to be secured by the husband's retirement account. Husband appeals the alimony award, the use of the retirement account as security for the payment of alimony, and the trial court's division of the marital property. Wife takes issue with the division of the parties' marital property. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., joined. D. MICHAEL SWINEY, J., filed a dissenting opinion.

Joseph L. Lackey, Jr., Nashville, Tennessee, for the appellant, Joseph Blount Turner.

Pamela A. Taylor, Nashville, Tennessee, for the appellee, Gloria Jean Weiss Turner.

### OPINION

#### I. *Facts*

In this divorce action, the trial court dissolved the marriage of Gloria Jean Weiss Turner ("Wife") and Joseph Blount Turner ("Husband"). The parties had been married for 26 years. At the time of the hearing, Wife was 54 and Husband was 56. Wife has an adult daughter from a prior marriage, and Husband has two adult sons from an earlier marriage.

The marriage began to falter in the early 1990's. According to the divorce complaint, Husband assaulted Wife with a gun on February 22, 1996. Subsequent to this incident, Wife sought an order of protection in General Sessions Court. In that proceeding, the court entered an agreed order whereby the parties agreed not to dissipate marital assets and to "continue to handle their household finances and pay their bills exactly as they [had] done in the past."

Husband subsequently filed for divorce on May 24, 1996. Another agreed order was entered on January 16, 1997. This order required Husband to pay Wife $2,250.00 per month as *pendente lite* support. Approximately five months later, Husband filed a voluntary non-suit of the divorce action and ceased making the monthly payments to Wife. Wife filed this divorce action on August 1, 1997.

Upon the institution of this action, various restraining orders issued, and Wife began to receive monthly payments in the amount of $1,640.55 from Husband's retirement account with J.C. Bradford, a stock brokerage firm. Meanwhile, Husband had applied for and received Social Security disability benefits, based upon a diagnosis of chronic depression, agoraphobia, panic attacks, and anxiety. He received one lump sum from Social Security for $13,000 "or so" and was drawing $1,170 monthly at the time of trial.

A divorce hearing was held on June 23 and 24, 1998, and October 27, 1998. Testimony at the hearing focused on the following areas: (1) the overall financial condition of the parties; (2) the J.C. Bradford retirement account; (3) the "Sugartree" residence; (4) a life insurance policy against which Husband had borrowed funds; (5) a lake front cabin located in Center Hill; (6) $80,000 allegedly stored in a safe on the parties' property; and (7) Husband's car business.

Husband testified that he developed, beginning in 1994, severe mental health problems, *i.e.*, chronic depression, agoraphobia, panic attacks, and anxiety. It was for this reason that he had been collecting monthly Social Security benefits. Wife testified that these conditions were due to Husband's heavy drinking and that he did not experience those symptoms when he did not drink.

Though Husband does not have a college degree, he enjoyed success in various facets of the automobile industry. He testified that he began to liquidate his car business in 1997 and that he was not employed at the time of trial. Wife testified that Husband's expenses as they related to the car business indicated he was still operating the business at the time of trial.

Husband stated that his only income at the time of trial was his monthly $1,170 disability check and the monthly $1,640.55 check he should have been receiving from his J.C. Bradford retirement account, but which was at that time going directly to Wife. He also testified that he had been receiving approximately $1,200 per month in the form of accounts receivable monies from various car lots, but that he would cease to receive that money in June, 1998. Three exhibits in the record relating to Husband's monthly living expenses show those expenses to be $2,050.60, $1,501.90, or $1,022.02.

Wife has worked as a co-manager of her family's liquor store, as an assistant manager at a car dealership in which Husband was involved, and as an assistant in Husband's own car business. She also assists, as a volunteer, in the operation of a sorority house. Wife received a bachelor's degree in political science in 1967; she minored in Spanish. An expert witness testified that under the circumstances, Wife could only expect to earn between $15,000 and $18,000 per year, a salary which would not enable her to approximate the standard of living she enjoyed during the marriage. The only income Wife was receiving at the time of the hearing was the monthly $1,640.55 check

from Husband's J.C. Bradford retirement account and $400 per month from a roommate who was to move out in December of 1997. Wife's monthly expenses are $3,328.88.

During the marriage, Husband entered into an agreement with his employer, Frank Davis Buick, to buy a certain amount of stock in the dealership. The deal went sour, however, and the parties settled. A portion of the settlement proceeds, approximately $176,000, went into Husband's J.C. Bradford retirement account. Wife was originally designated as the sole beneficiary. At some point Husband changed the beneficiary designation to his girlfriend, and he was subsequently forced by court order to change it back to Wife. With respect to the funds paid out of the account monthly, the court ordered J.C. Bradford to make the monthly payments of $1,640.55 directly to Wife. The value of the account at the time of trial was over $273,750.

Another $275,000 Husband received from Frank Davis Buick as part of the settlement agreement was used to pay off the balance of the parties' Sugartree residence. The property was originally titled jointly. On October 16, 1990, the property was placed in Wife's name only. Wife testified that this was done because Husband wanted to make sure that Wife was taken care of in case of his death. Husband testified that the reason for titling the property in Wife's name alone was to shield the asset from the threat of a lawsuit against a limited partnership in which he held an interest. In January or February, 1996, Husband attempted to persuade Wife to re-title the property into his name alone. Wife testified that she initially signed the document Husband proffered to her, under the belief that it was being re-titled back into both of their names jointly. When she discovered that the document she had signed placed the property into Husband's name alone, she voided the document, removed it from the house, and refused to give it back to Husband.

The testimony concerning the life insurance policy and the use of funds borrowed against the policy is vexing. At some point, Husband borrowed approximately $74,000 against this life insurance policy.[1] Husband spent approximately $19,000 of the loan proceeds on various bills, including attorney's fees, living expenses, and support payments to Wife. Husband also loaned approximately $24,000 of the loan proceeds to Nashville Motors.[2] Husband sent another $32,000 to his son, to be used for the lake front cabin.[3] At trial, the loan balance against the life insurance policy was approximately $80,000.

The lake front cabin was originally titled in the names of Husband and Wife jointly. On April 14, 1983, they quitclaimed the property to Husband's business. Husband then quitclaimed the property to his son on September 23, 1988. In addition to the $32,000 of the life insurance loan

---

[1] At about the same time, Husband sold some firearms, bringing in additional cash with which to complete subsequent transactions.

[2] Approximately $17,000 of this amount was collected at a rate of approximately $1,200 per month. Husband testified that the remainder could not be collected.

[3] This $32,000 has not been paid back.

proceeds Husband sent to his son, Husband sent another approximately $24,000 earned by his business to his son to be used toward the lake front cabin property. Husband testified that, in total, he has invested between $75,000 and $80,000 in the lake front cabin. This property was assessed for tax purposes at $103,800 and appraised at a value of $120,000.

Wife testified that there was between $80,000 and $90,000 in cash in the safe located in the residence as of November, 1995. Wife's daughter also testified that she had seen bundles of $100 bills in the safe. Husband denied that there was $80,000 in the safe. He also testified that, because the safe's lock mechanism sometimes malfunctioned, they kept the safe unlocked but in such a state that it appeared to be locked. In January, 1996, he found the safe actually locked. Because he could not get it open, he transported it to a locksmith and had it drilled open. He and the locksmith both testified that there was no large amount of cash in the safe when it was opened.

With respect to the car business, Wife assisted Husband, to some degree, in developing the business. At some point, the business paid off a $75,000 loan, and Husband told Wife that he would pay her an average of what he had been paying the bank in interest. Wife testified that she did not receive any such payment.

Husband testified that he operated his car business until the end of January, 1997, at which point he began to liquidate his inventory. He stated that he was not operating the car business at the time of trial, but that he was still incurring expenses in his attempts to liquidate his remaining inventory. According to his testimony, his inventory was never worth more than $75,000, and, at the time of trial, his business had no value at all. He stated that his remaining inventory was $6,000. Wife testified that Husband had told her in 1990 that the business' inventory was worth approximately $300,000. Based on this figure and the fact that Husband was still incurring expenses, Wife stated that she believed Husband was still operating the business, and she valued the business at $250,000.

Following a bench trial, the trial court:

> (1) granted a divorce to Wife as the party less at fault;
>
> (2) awarded the J.C. Bradford retirement account to Husband;
>
> (3) found that the Sugartree residence was "clearly marital property", determined its value to be $425,000, and awarded it to Wife;
>
> (4) found that the cash value of the life insurance policy and the amount of the loan against the policy were approximately equal, and awarded the policy to Husband with him being responsible for the debt against the policy;
>
> (5) found the lake front cabin to be marital property and awarded it to Husband;

-4-

(6) found that Husband had taken $80,000 from the safe and counted it towards his share of the marital assets; and

(7) found that the inventory of Husband's car business was $6,000, declared that it believed that Husband would still continue in the operation of the business, and awarded the value of the inventory to Husband.

Thus, the trial court divided the marital property as follows:

| Assets | Total | Wife | Husband |
|---|---|---|---|
| Sugartree residence | $    425,000 | $ 425,000 | |
| Lakefront cabin | 114,000 | | $114,000 |
| Car inventory | 6,000 | | 6,000 |
| Cash in safe | 80,000 | | 80,000 |
| Life insurance policy | - 0 - | | - 0 - |
| J.C. Bradford account | 273,758 | | 273,758 |
| Other personal property | 146,673 | 99,478 | 47,195 |
| Total | $1,045,431 | $ 524,478 | $ 520,953 |

In addition, the trial court stated that "[i]f there is any inequity in the distribution of marital funds, it will be awarded to [Wife] as alimony in solido."

Finally, the court awarded alimony to Wife, stating that:

[f]or [Wife] to even begin to approach her previous lifestyle, she will need some "closing in money." Therefore, the Court will award her periodic alimony in the amount of Sixteen Hundred Forty and 55/100 ($1,640.55) Dollars, however [Wife] shall be responsible for the taxes on said periodic alimony. This amount of money is secured by the $273,000 (previous amount of fund in 1996) retirement fund presently at J.C. Bradford. J.C. Bradford will send a check directly to [Wife] in that amount. After the year 2001, if the fund has grown enough to allow a payment greater than [$1,640.55], [Husband] may have additional monthly funds, so long as the fund will support

[$1,640.55] per month payable to [Wife]. [Husband] may designate the beneficiaries as he wishes, as he is the owner of the retirement fund.

Husband now appeals, raising as issues the following: (1) the trial court's award of periodic alimony to Wife and the use of the J.C. Bradford retirement account to secure payment of the alimony award; and (2) the trial court's division of the marital property, more specifically, its treatment of the loan on the life insurance policy and its treatment of the J.C. Bradford retirement account. Wife takes issue (1) with the trial court's finding that the Sugartree residence is marital property; and (2) with the trial court's valuation of the car business.

## II. *Standard of Review*

Because this is a non-jury case, our review is *de novo* upon the record of the proceedings below. That record comes to us with a presumption of correctness as to the trial court's factual findings, a presumption that we must honor unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d). We review the trial court's conclusions of law *de novo* with no presumption of correctness. **Adams v. Dean Roofing Co.**, 715 S.W.2d 341, 343 (Tenn. Ct. App. 1986).

Our *de novo* review is also subject to the well-established principle that the trial court is in the best position to assess the credibility of the witnesses; accordingly, such determinations are entitled to great weight on appeal. **Massengale v. Massengale**, 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995); **Bowman v. Bowman**, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991).

## III. *Analysis*

### A. Division of Property

Both Husband and Wife quibble with the trial court's division of property. Husband argues that the division was inequitable because (1) he was credited with receiving the J.C. Bradford retirement account but not given any control over it; and (2) because he was made responsible for the debt against the life insurance policy. Wife argues that the trial court erred (1) in finding the Sugartree residence to be marital property; and (2) in its valuation of the car business.

In divorce cases, Tennessee recognizes two distinct classes of property: (1) "marital property," as defined in T.C.A. § 36-4-121(b)(1) (1996); and (2) "separate property," as defined in T.C.A. § 36-4-121(b)(2) (1996). The distinction is important because, in an action for divorce, only marital property is divided, distributed, or assigned between the parties. *See* T.C.A. § 36-4-121(a)(1) (1996). Implicit in the statute is the understanding that separate property is not divided between the parties. **Brock v. Brock**, 941 S.W.2d 896, 900 (Tenn. Ct. App. 1996).

Generally, property that is acquired during the marriage by either or both spouses and still owned by either or both spouses when the divorce complaint is filed is classified as marital property and is thus subject to equitable division. T.C.A. § 36-4-121(b)(1). However, property acquired by

a spouse by gift, bequest, devise or descent, even if acquired during the marriage, is separate property and not subject to division. *See* T.C.A. § 36-4-121(b)(2)(D).

A court's division of marital property must be done in accordance with the statutory factors found in T.C.A. § 36-4-121(c). Marital fault cannot be considered. T.C.A. § 36-4-121(a)(1).

"[A]n equitable property division is not necessarily an equal one. It is not achieved by a mechanical application of the statutory factors, but rather by considering and weighing the most relevant factors in light of the unique facts of the case." *Batson v. Batson*, 769 S.W.2d 849, 859 (Tenn. Ct. App. 1988). It is not necessary that both parties receive a share of each piece of property. *Thompson v. Thompson*, 797 S.W.2d 599, 604 (Tenn. Ct. App. 1990).

Marital debt is to be treated similarly to marital property. It

> should be divided equitably in accordance with the factors in Tenn. Code. Ann. § 36-4-121(c) and in light of (1) which party incurred the debt, (2) the purpose of the debt, (3) which party benefitted from incurring the debt, and (4) which party is better able to repay the debt. Marital debts need not be divided in precisely the same manner as the marital assets, although they frequently follow their related assets.

*Kinard v. Kinard*, 986 S.W.2d 220, 233 (Tenn. Ct. App. 1998) (citations omitted).

Appellate courts are to defer to a trial court's division of marital property unless the trial court's decision is inconsistent with the statutory factors or is unsupported by the preponderance of the evidence. *Brown v. Brown*, 913 S.W.2d 163, 168 (Tenn. Ct. App. 1994).

The trial court's division of marital property gave $524,478 to Wife and $520,953 to Husband. Husband argues, however, that because the trial court ordered that the J.C. Bradford retirement account be utilized as security for the payment of alimony, Husband effectively has no control over the account, and thus, so the argument goes, the trial court effectively awarded the account to Wife, resulting in a split of $798,236 to Wife and $247,195 to Husband.

We find this argument to be without merit. Husband's own behavior compelled the trial court to utilize the retirement account as security for Husband's payment of alimony to Wife. Though it secures the payment of alimony, the account itself still belongs to Husband. Upon the death or remarriage of Wife, Husband will have complete control over the entire value of the account. Moreover, T.C.A. § 36-5-101(a)(1) specifically allows a court to award support out of a spouse's property. Therefore, we find this issue adverse to Husband.

Husband next argues that it was error to make him solely responsible for the debt against the life insurance policy. More specifically, he argues that (1) because $32,000 of the funds borrowed

against the insurance policy was used to build the lake front cabin; and (2) because he was awarded the full value of the cabin, the trial court has effectively assessed the $32,000 against him twice.

We disagree. Husband's argument ignores the fact that the cash value of the life insurance policy at the time of trial was "approximately equal" to the debt against the policy. Thus, the trial court awarded the life insurance policy to Husband and assigned it a value of zero. The debt against the life insurance policy is set off by the cash value of the policy. Therefore, we find that the trial court did not err in its treatment of the life insurance policy.

Wife argues that the trial court erred in classifying the Sugartree residence as marital property. More specifically, she asserts that while shielding the residence from a potential lawsuit may have been a factor in transferring the residence to Wife, Husband's primary motivation was to provide for Wife in the event of his death.

To be valid, a gift requires (1) the intent of the donor to make a gift; and (2) delivery, whereby the donor surrenders complete dominion and control over the property. *Hansel v. Hansel*, 939 S.W.2d 110, 112 (Tenn. Ct. App. 1996). Although a conveyance of property between spouses creates a rebuttable presumption of a gift, it is not conclusive evidence on the issue. *See Robbins v. Robbins,* C/A No. 01A01-9201-CV-00031, 1992 WL 187637, at *3 (Tenn. Ct. App. M.S., filed August 7, 1992); *see also Abney v. Abney*, C/A No. 181, 1991 WL 16255, at *3 (Tenn. Ct. App. E.S., filed February 12, 1991).

The trial court found, without elaboration, that the real estate in question was the marital property of the parties. It did so despite the fact that Husband executed a quitclaim deed to Wife ostensibly conveying his interest in the property to Wife. Implicit in the trial court's decision to classify the property as marital property is the court's finding that the deed, for whatever reason, did not have the effect of conveying the property to Wife as her separate property. Apparently, the trial court accredited the testimony of Husband to the effect that the purpose of the deed to Wife was to shield the residence from the threat of a lawsuit. Since the trial court apparently believed Husband's testimony, this credibility determination effectively precludes us from finding that the evidence preponderates against the trial court's classification of the subject property as marital property.

Wife next argues that "the trial court erred in failing to give [Husband's] car business a value to be divided equitably between the parties given that it found that [Husband] was still in the business of selling cars."

The value to be given a marital asset is a question of fact. *Kinard v. Kinard*, 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998). In making this determination, the trial court is to consider all relevant evidence, and, if the evidence is conflicting, the court "may assign a value that is within the range of values supported by the evidence." *Id*. An appellate court is to presume a trial court's factual determinations are correct unless the evidence preponderates against them. *Id*.

-8-

Wife testified that Husband had told her in 1990 that the business' inventory had an approximate value of $300,000. She also opined that the fact that Husband was still incurring expenses at the time of trial indicates that he was still operating the business, and she therefore concluded that the value of the business was $250,000. Husband, on the other hand, testified that he began to liquidate his inventory in 1997 and that he was not operating the car business at the time of trial. He stated that he was still incurring expenses in his attempt to liquidate the remaining inventory which he valued at $6,000.

Based upon this evidence, the trial court stated the following:

> The Court has real difficulty determining if [Husband] has an ongoing business or not. For the purposes of this divorce, the court will accept that he has $6,000 in inventory left, but it is highly suspect if that is the actual number or if he is totally out of business. The court believes that [Husband] will still continue in the car business.

We find no error in the trial court's treatment of the car business. The trial court's findings with respect to this issue are again based on the trial court's factual findings and its assessment of the credibility of the witnesses. These determinations are entitled to great weight on appeal. *See Massengale v. Massengale*, 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995). After careful review of the record, we find and hold that the evidence does not preponderate against the trial court's valuation of the car business and its award of the business to Husband.

## B. Alimony

Husband first argues that the trial court erred in its award of periodic alimony to Wife in light of the legislative preference for rehabilitative alimony, Husband's inability to pay alimony, and Wife's ability to support herself.

The amount and duration of alimony are issues with respect to which the trial court exercises wide discretion. *Garfinkel v. Garfinkel*, 945 S.W.2d 744, 748 (Tenn. Ct. App. 1996). In making an alimony determination, a court should be guided by the factors set forth in T.C.A. § 36-5-101(d)(1)(A) – (L) (Supp. 1999). The "real need" of the requesting spouse "is the single most important factor." *Cranford v. Cranford*, 772 S.W.2d 48, 50 (Tenn. Ct. App. 1989). "In addition to the need of the disadvantaged spouse, the courts most often consider the ability of the obligor spouse to provide support." *Id*. The fault of the obligor spouse is also a common factor. *Bull v. Bull*, 729 S.W.2d 673, 675 (Tenn. Ct. App. 1987). The amount of alimony should be determined so "that the party obtaining the divorce [is not] left in a worse financial situation than he or she had before the opposite party's misconduct brought about the divorce." *Shackleford v. Shackleford*, 611 S.W.2d 598, 601 (Tenn. Ct. App. 1980) (citations omitted).

The relevant statute, T.C.A. § 36-5-101, clearly reflects a bias in favor of rehabilitative alimony. *See* T.C.A. § 36-5-101(d)(1) (Supp. 1999). "The purpose of rehabilitative support is to enable the disadvantaged spouse to acquire additional job skills, education, or training that will

enable him or her to be more self-sufficient." ***Anderton v. Anderton***, 988 S.W.2d 675, 682 (Tenn. Ct. App. 1998). Where rehabilitation is not feasible, however, "courts may still award long-term support and maintenance until remarriage or death of the recipient," ***Isbell v. Isbell***, 816 S.W.2d 735, 739 (Tenn. 1991), because long-term spousal support is designed "to provide support to a disadvantaged spouse who is unable to achieve some degree of self-sufficiency." ***Anderton***, 988 S.W.2d at 682. Even where divorced couples lack sufficient resources to enable both of them to enjoy their pre-divorce standard of living, courts may award alimony as 'closing in money' to enable the recipient spouse to more closely approach his or her pre-divorce standard of living. *See **Aaron v. Aaron***, 909 S.W.2d 408, 411 (Tenn. 1995).

We find that the evidence does not preponderate against the trial court's award of periodic alimony to Wife. Though Wife has a college degree and some degree of work experience, her earning capacity is no greater than $18,000 per year, a salary insufficient to allow her to reach a reasonable standard of living when measured in relation to the standard of living she and Husband enjoyed during the marriage. Though Husband has no college degree and is receiving disability, the trial court found it likely that Husband would continue in the car business. In any event, we find that he has the resources out of which to pay Wife $1,640.55 in monthly periodic alimony.

In arguing that the alimony award should have been rehabilitative rather than long-term, Husband relies on ***Anderton v. Anderton***, 988 S.W.2d 675 (Tenn. Ct. App. 1998). In that case, we stated that

> [u]nder the facts of this case, we have determined that Ms. Anderton should receive rehabilitative spousal support. She is currently forty-five years old. She earned a college degree in May 1996 and for many years participated in running a financially successful Amway distributorship. Her health and emotional complaints simply do not rise to the level of seriousness that they prevent her from becoming gainfully employed. After hearing the evidence on remand, the trial court found that Ms. Anderton's "physical limitations and disabilities do not preclude economic rehabilitation." Accordingly, the trial court concluded that she "will probably become capable of financial self support, but there is a substantial possibility that she will not." We find that the evidence preponderates in favor of the trial court's conclusion that Ms. Anderton is capable of financial self support.

*Id*. at 683.

We decline to find sufficient similarities between the facts in ***Anderton*** and the facts of the instant case to warrant a reversal of the trial court's award of periodic alimony. Wife in the instant case is older, her college degree is stale, and the evidence is insufficient to conclude that her work experience rises to the level of ***Anderton's*** "financially successful Amway distributorship." More importantly, the trial court in the instant case has not specifically found that Wife is capable of

financial self-support; nor do we. Therefore, we find and hold that the trial court did not err in awarding Wife periodic alimony in the amount of $1,640.55 per month.

## C. Security for the Alimony Award

Finally, Husband argues that the trial court erred in utilizing the J.C. Bradford account as security for Husband's payment of alimony. He relies again on *Anderton*, in which we found that the trial court erred in leaving a temporary restraining order on a retirement account that had been awarded to the husband in the division of marital property. *Anderton*, 988 S.W.2d at 683.

We find that the trial court did not err in utilizing the J.C. Bradford retirement account to secure Husband's payment of alimony to Wife. It was Husband's failure, on several occasions, to make court-ordered payments to Wife that prompted the trial court's decision to order that the payments be made directly from the retirement account. The account still belongs to Husband. The payments from the account are limited in duration until the death or remarriage of Wife, at which time Husband will have complete control over both the fund and the payments. *Anderton* is distinguishable on its facts in that there is no indication in that case that the husband demonstrated that he could not be trusted to make the payments. In addition, we note that a court may award "suitable support and maintenance of either spouse…out of [a] spouse's property." T.C.A. § 36-5-101(a)(1) (Supp. 1999). Therefore, we find no error on this issue.

## IV. *Conclusion*

The judgment of the trial court is affirmed. The case is remanded for enforcement of the judgment and collection of costs assessed below, all pursuant to applicable law. Costs on appeal are taxed to the appellant.

_____
CHARLES D. SUSANO, JR., JUDGE